UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RALPH PISTORESE,

        Plaintiff,

  v.

TRANSAMERICA LIFE
INSURANCE COMPANY,

        Defendants.

C12-1083Z

ORDER

THIS MATTER comes before the Court on cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment (docket no. 18), and Defendant's Motion for Summary Judgment (docket no. 19).  Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following Order.

**<u>Background</u>**

Ralph Pistorese was a Washington resident who contracted with Transamerica's predecessor in interest for a long-term care insurance policy, which took effect on August 9, 1993.  Ex. 1 to Hayes Aff. (docket no. 20-2) [hereinafter the "Policy"].  The primary benefit of the Policy is a daily "Nursing Home Benefit" of $100, with a maximum

ORDER - 1

lifetime benefit of $150,000.  Id.  The Policy pays for "all levels of care" so long as the services are "provided in a Nursing Home."  Id. at 9.  The Policy defines "Nursing Home" in relation to five elements, and a facility meets this definition if it:

> (1) is operating under a license issued by the appropriate licensing agency; (2) is engaged in providing, in addition to room and board accommodations, nursing care and related services on a continuing inpatient basis to 3 or more individuals; (3) provides on a formal prearranged basis, a Nurse who is on duty or on call at all times; (4) has a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician; and (5) maintains a clinical record of each patient.

Id. at 8.

When Mr. Pistorese contracted for the Policy in 1993, Washington regulated and licensed long-term care facilities designated as "nursing homes" and "boarding homes." RCW 18.51.030 (nursing homes licensed since 1951); Laws of 1957, ch. 253, § 3 (boarding homes licensed since 1958).  The boarding home regulations have been amended numerous times.[1]  In 2003-04, boarding homes were first authorized to provide "intermittent nursing services" to residents.[2]  See Laws of 2003, ch. 231, § 2; Laws of 2004, ch. 142, §§ 1, 5, 12.  Authorized services include administration of medication subject to certain conditions, but otherwise boarding homes are prohibited from admitting residents "requiring nursing or medical care of a type provide by" licensed nursing

---

[1] The current version of the regulations has done away with the term "boarding home" and replaced it with "assisted living facility."  RCW 18.20.020 et seq. (2013).

[2] In 1993, "boarding homes" were defined as facilities that provided "board and domiciliary care," however the regulations did not define "domiciliary care" as including "intermittent nursing services." See RCW 18.20.020 (1993).  Nonetheless, the regulations permitted boarding homes to provide supervised medication services so long as a registered nurse was available and a doctor had ordered that such services were necessary.  RCW 18.20.160 (1993).

ORDER - 2

1  homes.  RCW 18.20.160 (2006).[3]  As such, boarding homes generally are restricted from

2  admitting residents who "require[] the frequent presence and frequent evaluation of a

3  registered nurse."  Id.

4      In 2009, Mr. Pistorese received a pacemaker, and by 2010 he had been

5  hospitalized several times after falling.  Ex. 2 to Chapman Decl. (docket no. 18-3, at 28).

6  He also suffered from bradycardia, hypertension, cellulitis, thrombocylopenia, and

7  dementia.  Id.

8      On January 15, 2010, Mr. Pistorese's son arranged for Aegis Senior Inn of

9  Redmond ("Aegis") to provide a room and other services for Mr. Pistorese.  See Ex. 10 to

10  Hayes Aff. (docket no. 23-3, at 28, 45).  Aegis is licensed under Washington law as a

11  boarding home.  Ex. 8 to Hayes Aff. (docket no. 20-3, at 14).  In a "Disclosure of

12  Services" document provided to Mr. Pistorese, Aegis stated that it provides "intermittent

13  nursing services," including help with medication, administration of health care

14  treatments, as well as care for residents with dementia.  Ex. 9 to Hayes Aff. (docket no.

15  20-3, at 22-23).  Aegis stated that it only admits residents whose health conditions do

16  "not require the frequent presence and evaluation of a registered nurse."  Id.  When Mr.

17  Pistorese moved into Aegis in January 2010, he required monitoring for infection at the

18  pacemaker site until it healed, and was prescribed nitroglycerin along with other

19  medications.  Ex. 2 to Chapman Decl. (docket no. 18-3, at 23-29).

---

[3] The version of the regulations in force when Mr. Pistorese began residing in the two boarding homes, as well as when he filed both insurance claims, was last revised in 2006.  See Laws of 2006, ch. 242 (effective June 7, 2006 through July 22, 2011).  Unless otherwise stated, all references to the boarding home regulations refer to the 2006 version.

ORDER - 3

On January 26, 2011, Mr. Pistorese's wife transferred him to Clare Bridge of Lynnwood, Brookdale Senior Living ("Clare Bridge").  Ex. 29 to Hayes Aff. (docket no. 20-6); Todd Pistorese Dep. at 82:5-12, Ex. C to Hayes Aff. (docket no. 21-2, at 26). Similar to Aegis, Clare Bridge is a licensed boarding home that provides intermittent nursing services for residents, including administration of medication and dementia care. Ex. 27 to Hayes Aff. (docket no. 20-6, at 5); Ex. 28 to Hayes Aff. (docket no. 20-6, at 12-13).  Mr. Pistorese lived at Clare Bridge until his death on December 13, 2012.

Shortly after moving into each facility, Mr. Pistorese filed a claim with Transamerica to receive benefits under the Policy.  See Exs. 7, 26 to Hayes Aff.  After gathering information to determine whether the services were covered by the Policy, Transamerica issued claim determinations denying benefits.  See id.; Exs. 14, 32 to Hayes Aff.  The Pistorese family filed several requests for reconsideration that were denied.  See Exs. 15-16, 18, 25, 34-37 to Hayes Aff.  Transamerica informed the Pistoreses that it had determined that Aegis and Clare Bridge did not provide "nursing care and related services on a continuing inpatient basis" and therefore did not qualify as "nursing homes" under the Policy.  See Exs. 16, 19, 35, 37 to Hayes Aff.  The basis for this determination was that Aegis and Clare Bridge, as licensed boarding homes, were only authorized to provide "intermittent nursing services," which Transamerica argued prohibited them from providing nursing care on a continuing inpatient basis.  Id.

Maxine Pistorese, individually and in her capacity as the representative of her late husband's estate, filed this suit seeking declaratory judgment that the care Mr. Pistorese received in Aegis and Clare Bridge is covered by the Policy; breach of contract for the

ORDER - 4

failure to pay benefits for Mr. Pistorese's stays in Aegis and Clare Bridge; and breach of the duty of good faith and fair dealing in processing the claims for benefits.

**Discussion**

    **A. Preliminary Matter – Transamerica's Motion to Strike**

In its response to Plaintiff's motion, Transamerica moves to strike paragraphs 3, 12, 17, and 18 of the affidavit submitted by Angela Brigance, the former executive director of Aegis. See Ex. 4 to Chapman Decl. (docket no. 18-3, at 33-38). Transamerica alleges that these paragraphs contain "conclusory opinions" based on misstatements of the Policy ("an improper foundation") and are not competent summary judgment evidence.

Transamerica's argument is without merit. The affidavit does not misstate the Policy, but rather provides Brigance's interpretation of the Policy based on her first-hand knowledge of the services provided by Aegis while Mr. Pistorese was a resident. See Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008) (summary judgment affidavit proper when based on "personal knowledge of specific facts"). The motion to strike is DENIED.

    **B. Standard**

Summary judgment is proper if the moving party establishes that there is no genuine issue of material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden, which, if met, then shifts to the non-moving party to present specific facts in the record showing a genuine

ORDER - 5

1 dispute of material fact. Celotex Corp. v. Carett, 477 U.S. 317, 324 (1986).[4]  "The mere

2 existence of a scintilla of evidence in support of the non-moving party's position is not

3 sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1986).

**C.  First Three Causes of Action – Interpretation of the Policy**

Ms. Pistorese's first three causes of action turn on whether Aegis and Clare Bridge qualify as nursing homes pursuant to the Policy.  Both Parties agree that Washington law governs interpretation of the Policy.

Under Washington law, insurance policies are construed as contracts.  See RCW 48.01.040.  The method courts use for interpreting an insurance policy is well settled:

> An insurance policy is construed as a whole, with the policy being given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance. If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. If the clause is ambiguous, however, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.

///

///

---

[4] Transamerica urges the Court, pursuant to Fed. R. Civ. P. 56(e), to consider as undisputed the first "factual" section of its motion for summary judgment because Plaintiff failed to directly refute each of the "factual" claims.  However, many of the assertions in the section are legal arguments disguised as factual recitations.  For example, paragraph 15 states that "Transamerica further concluded that a Washington 'boarding home' cannot 'provide nursing care and related services on a continuing inpatient basis' as provided by a licensed 'nursing home.'"  Defendant's Motion for Summary Judgment at 8.  While it is *factually* true that Transamerica concluded this, whether or not this *legal* conclusion is correct is at the heart of the case.  The Court therefore declines to treat these assertions as established facts for the purposes of the present motions.  See Fed. R. Civ. P. 56(e) (court "may" consider recitation of facts as undisputed if not challenged by opposing party).

ORDER - 6

Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn. 2d 654, 666 (2000) (internal quotation omitted).  Generally, the interpretation of an insurance policy is a question of law.  Weyerhaeuser Co. v. Aetna Cas. & Sur. Co., 123 Wn. 2d 891, 897 (1994).

**1. Whether Aegis and Clare Bridge provide "nursing care and related services on a continuing inpatient basis"**

**a. The Clause Is Not Ambiguous**

The central issue is whether Aegis and Clare Bridge satisfy the second element of the Policy's "nursing home" definition.  The second element requires that a covered facility must be "engaged in providing . . . nursing care and related services on a continuing inpatient basis."  Policy at 8.  The Parties dispute the meaning of the word "continuing," and the crucial dispute is not over the definition of "continuing" but rather which part of the clause it modifies.  Ms. Pistorese argues that the word "continuing" modifies the phrase "inpatient basis" and therefore a facility satisfies the second element if its residents receive some nursing care during an "ongoing" or non-temporary stay at the facility.  Transamerica responds that the word "continuing" effectively modifies the entire clause, and consequently the second element requires a facility to provide "continuing nursing care."

The Policy's language describing the second element is unambiguous and supports Plaintiff's interpretation.  Ms. Pistorese offers a straightforward interpretation that reads the adjective "continuing" as modifying the phrase immediately following it ("inpatient basis").  As Ms. Pistorese urges, an average insurance buyer would reasonably interpret the clause as focusing on whether the residents in a facility are *continuing inpatients* who

ORDER - 7

receive some nursing care. Transamerica responds that while the adjective "continuing" may modify the word "inpatient," the more important point is that the entire prepositional phrase "on a continuing inpatient basis" modifies the type of "nursing care" that must be provided. Reading these two phrases together, Transamerica's interpretation construes the second element as requiring a covered facility to provide *continuing nursing care*. However, Transamerica cannot escape the fact that the Policy simply does not state that there must be "continuing nursing care," but rather dictates that nursing care must be provided "on a continuing inpatient basis." Transamerica's interpretation is strained, requiring "continuing" to directly modify "inpatient basis" and also indirectly modify "nursing care." See Moeller v. Farmers Ins. Co. of Wash., 173 Wn. 2d 264, 272 (2011) (insurance policy should not be given "strained or forced construction"). In essence, Transamerica asks the Court to rewrite the Policy so that a covered facility must be "engaged in providing . . . continuing nursing care and related services on a[n] ~~continuing~~ inpatient basis." However, "it is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves." Panorama Vill. Condo. Owners Ass'n Bd. of Directors v. Allstate Ins. Co., 144 Wn. 2d 130, 137 (2001) (citation omitted).

      Plaintiff's interpretation is further supported by reading the second element in conjunction with the third, which requires that a nurse be "on duty *or on call* at all times." Policy at 8 (emphasis added). See Weyerhaeuser, 142 Wn. 2d at 666 (insurance policy must be interpreted "as a whole"). The Policy's conjunctive, five-part definition of a nursing home requires interpreting the provision of "nursing care . . . on a continuing

ORDER - 8

inpatient basis" as consistent with the availability of a nurse who is merely on call. As Ms. Pistorese contends, it is doubtful that a facility that only offers services from an *on call* nurse could satisfy Transamerica's interpretation of the second element by providing continuous nursing care "without interruption." The average insurance buyer would not expect an on call nurse to provide "continuous nursing care," and, indeed, nor does Transamerica, which suggests in its briefing that Aegis and Clare Bridge cannot satisfy the second element because there are shifts in which a nurse is merely on call. See Response to Plaintiff's Motion for Partial Summary Judgment at 11. Transamerica's interpretation would eliminate the third element's "on call" provision, and thus would fail to "give[] effect to each provision" of the Policy. McDonald v. State Farm Fire & Cas. Co., 119 Wn. 2d 724, 734 (1992). Accordingly, interpreting the Policy "as a whole" by reading the second and third elements of the nursing home definition together establishes that the Policy unambiguously does not require "continuous nursing care."[5]

### b. Washington Licensing Regulations Do Not Prohibit the Court's Interpretation

The crux of Transamerica's argument that the Policy excludes boarding homes is not rooted in the language of the Policy itself; instead, it depends on changes in Washington law that began in 2003[6] and altered the license requirements of boarding

---

[5] Even if the Court accepted Transamerica's interpretation of the second clause as a "reasonable" one, this would only suffice to render the Policy ambiguous. Given the lack of extrinsic evidence of the Parties' intent at the time the Policy was issued, this Court would nonetheless construe the Policy against the drafter-insurer and in Ms. Pistorese's favor. See Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn. 2d at 666.

[6] Although Transamerica states that the changes allowing boarding homes to provide "intermittent nursing services" occurred in 2004, it appears that this language first appeared in the 2003 amendments to

ORDER - 9

homes. Transamerica contends that the licensing regulations render boarding homes unable to offer nursing care "on a continuing inpatient basis" as a matter of law, and the Policy must be interpreted so that the payment of benefits complies with this restriction. The Court cannot agree.[7]

First, it is important to highlight that the licensing regulations adopted in 2003-04 play a very limited role in interpreting the Policy issued to Mr. Pistorese in 1993. By repeatedly peppering its arguments about the meaning of the second element with references to the regulations, Transamerica seems to suggest that the amended boarding home regulations may generally function as an interpretive tool in determining the meaning of the Policy. Here, however, the relevant regulations entered into force ten years *after* the issuance of the Policy, and thus do not shed light on the intentions of the Parties when the contract was formed.

The amended regulations are important, however, in that they place certain restrictions on the type of care that licensed boarding homes may provide, and the Court will not construe the Policy as requiring coverage for care that exceeds the boarding homes' statutory authority. See Walsh v. Schlecht, 429 U.S. 401, 408 (1977) ("contracts should not be interpreted to render them illegal and unenforceable where the wording

---

the regulations. See Laws of 2003, ch. 231, § 2 (amendment to RCW 18.20.020(5)). The regulation was amended again in 2004 to provide more guidance on the scope of authorized intermittent nursing services. See Laws of 2004, ch. 142, §§ 1, 5, 12.

[7] The effect of Transamerica's argument is that only nursing homes licensed as such in the State of Washington can satisfy the Policy's definition. However, this position is a backdoor attempt to rewrite the first element of the Policy's "nursing home" definition, which only requires a covered facility to operate under "*a license* issued by the appropriate licensing agency," and does not expressly require a facility to be licensed *as a nursing home*. See Policy at 8.

ORDER - 10

lends itself to a logically acceptable construction that renders them legal and enforceable"). Hence, the Washington regulations are relevant only if they prohibit Ms. Pistorese's interpretation. This inquiry is analytically distinct from the position that the regulations may shed light on the meaning of key terms or syntax used in the Policy; it is one thing to ask whether there is a conflict between a regulation and a particular interpretation of a contract, but it is quite a different thing to use regulations as a heuristic device when interpreting a contract. The Court limits itself to determining whether the regulations foreclose its interpretation of the Policy.

Licensed boarding homes in Washington are authorized to provide room and board, and may also provide "domiciliary care" to residents. RCW 18.20.020(1). "Domiciliary care" is defined as including "intermittent nursing services." Id. at 18.20.020(7). "The boarding home licensee may choose to provide any of the following intermittent nursing services . . . (a) Medication administration; (b) Administration of health care treatments; (c) Diabetic management; (d) Nonroutine ostomy care; (e) Tube feeding; and (f) Nurse delegation consistent with chapter 18.79 RCW." Id. at 18.20.330(1). However, boarding homes may only provide such services "to the extent permitted by RCW 18.20.160." Id. at 18.20.330(4). That section conditions the provision of a "supervised medication service" upon the availability of a registered nurse and obtaining a doctor's order that the medication service is required. RCW 18.20.160. It otherwise prohibits boarding homes from admitting residents who require care "of a type" provided by licensed nursing homes. Id. The regulations specify that boarding

ORDER - 11

homes may not admit residents who require "the frequent presence and frequent evaluation by a registered nurse," except in several circumstances not relevant here. Id.

These licensing regulations do not, as a matter of law, prohibit Aegis and Clare Bridge from providing "nursing care and related services on a continuing inpatient basis." The regulations expressly authorize boarding homes to provide a range of nursing care to residents, provided that the residents do not require other nursing services that fall within the exclusive purview of licensed nursing homes or require "frequent" attention from a registered nurse. The repeated use of the word "resident" makes clear that the regulations envision that the authorized "intermittent nursing services" can be provided to people who stay at the boarding home for a prolonged or ongoing period of time. The regulations thus contemplate that boarding homes may provide a limited range of nursing care to residents on a continuing basis.[8]  For example, a resident who has a stable health condition and receives supervised medication services may not need the "frequent presence and frequent evaluation by a registered nurse." Rather, such a resident may only need periodic attention by a nurse to monitor compliance with the prescription during the period of his or her residency at the boarding home. This is precisely the type

---

[8] Although from a jurisdiction with a different regulatory context, Gould v. Transamerica Life Ins. Co., 2013 WL 68873 (S.D. Ala. Jan. 3, 2013) is instructive. Based on a distinction in the Alabama regulations between "skilled" and "unskilled" nursing, Gould held that the regulatory limitations on the type of nursing services an assisted living facility could provide only prohibited certain skilled nursing services, and that the policy allowed for coverage in a facility that offered unskilled nursing care. Id. at *3-4. Although the Washington regulations do not explicitly differentiate skilled and unskilled nursing, the prohibition on admitting residents who require care "of a type" provided by licensed nursing homes or who require "frequent" evaluation from a registered nurse approximates this distinction. See RCW 18.20.160. The Washington regulations restrict boarding homes from providing only certain types of nursing care, and Transamerica fails to establish that the Policy *requires* a facility to provide those prohibited services.

ORDER - 12

of "intermittent" care that the regulations authorize boarding homes to provide, and which Aegis and Clare Bridge did in fact provide to Mr. Pistorese.

Transamerica makes much of the surface-level incongruity between the regulatory limitation that boarding homes may only provide "*intermittent*" nursing services and the Policy's requirement that a covered facility provide nursing care "on a *continuing* inpatient basis." Yet the supervised medication example – a nursing service expressly authorized by the regulations – demonstrates how a facility could easily provide *intermittent nursing care on a continuing inpatient basis*. The statutory term "intermittent" directly modifies the phrase "nursing services" and relates to the *frequency* with which services are provided, whereas the Court holds that the contract term "continuing" modifies the phrase "inpatient basis" and relates to the *duration* for which services are provided. Therefore, the Court's interpretation of the Policy is not inconsistent with the licensing regulations. Indeed, if the Court were to adopt Transamerica's position that the term "intermittent" necessarily prohibits a boarding home from providing periodic nursing services over a prolonged duration, the result would either (1) invalidate the portions of the regulations explicitly authorizing boarding homes to provide infrequent nursing services to residents, or (2) require that, after a certain period of time, boarding homes must discharge residents who receive periodic nursing services lest the length of their stay render the services not "intermittent." This would be an unreasonable interpretation of the regulations.

Transamerica relies heavily on McDermott v. Life Investors Ins. Co., 2007 WL 3273496 (W.D. Wash Nov. 1, 2007). McDermott involved a similar long-term care

insurance policy issued in Washington that provided a five-point definition of a "nursing home." 2007 WL 3273496 at *2.  At issue was the second element of the definition, which is identical to the contested clause in Mr. Pistorese's Policy.  Id.  McDermott held that the clause required covered facilities to provide "continuous nursing care," which, as a matter of law, boarding homes could not provide given their limited statutory authority to provide only "intermittent nursing services."  Id. at *4.  Insofar as McDermott construed the second element as unambiguously requiring a facility to provide "continuous nursing care," this Court reaches a different interpretation.  McDermott adopted the insurance company's interpretation without providing any analysis in the order, and stated that the policy requires "continuous nursing care."  Id. at *4.  In so doing, McDermott refashioned the actual language of the policy.  As here, the policy actually stated that a facility must provide "nursing care . . . on a *continuing inpatient basis*."  Id. at *2 (emphasis added).

Additionally, Transamerica argues that the Washington Department of Social and Health Services ("DSHS") agreed that the licensing regulations prohibit coverage. Transamerica stretches the content of the letter authored by DSHS.  See Ex. 13 to Hayes Aff. (docket no. 20-4, at 62).  In response to an inquiry by Transamerica about whether licensed boarding homes may provide nursing care on a continuing inpatient basis, DSHS cited to language in the regulations authorizing the provision of intermittent nursing services and prohibiting the admission of patients who require frequent attention from a registered nurse.  See id.  The letter then concludes that "boarding homes are not to provide *continuous nursing care*."  Id. (emphasis added).  However, this conclusion begs

the question as to whether *the Policy* requires continuous nursing care. Although DSHS may be entitled to deference in the way that it interprets the regulations, it is within the province of the Court to interpret the Policy itself.

Transamerica cites to several cases from other jurisdictions to support its interpretation of the Policy, but these cases are neither controlling nor persuasive. All these cases are inapposite because they involve interpretations of policies that contained materially distinct provisions and were interpreted in light of the regulations of other states. See Gillogly v. Gen. Elec. Capital Assur. Co., 430 F.3d 1284, 1287, 89-90 (10th Cir. 2005) (policy expressly excluded coverage for "residence homes" and construed under Oklahoma law); Michel v. Am. Family Life Assur. Co., 481 F. Supp. 2d 887, 888 (N.D. Ohio 2007) (policy provided coverage in "skilled or intermediate nursing facility . . . licensed as such by the state" and construed under Ohio law); Geary v. Life Investors Ins. Co. of Am., 508 F. Supp. 2d 518, 519, 524 (N.D. Tex. 2007) (policy required covered facility to "engage primarily in providing nursing care," which was prohibited for assisted living facilities by Texas law); Gregg v. IDS Life Ins. Co. of New York, 681 N.Y.S. 2d 451, 454 (N.Y. Sup. Ct. 1998) (policy expressly excluded coverage for "residence homes" and construed under New York law). Similarly, Crutchfield ex rel. Crutchfield v. Transamerica Occidental Life Ins. Co., 894 F. Supp. 2d 971, 975 (W.D. Ky. 2012) is inapposite because it did not refer specifically the second element at issue here. Rather, in Crutchfield, the court concluded that the policy did not provide coverage because the insured conceded that one of the other five elements of the "nursing home" definition was not met, and she could not obtain coverage under a "substantial

ORDER - 15

compliance" provision because she admittedly did not seek pre-certification as expressly required by the policy. Id.

It follows that neither the licensing regulations nor the other authorities cited by Transamerica[9] prohibit the Court's interpretation of the second element of the nursing home definition. Consequently, the Court holds as a matter of law that the second element is unambiguous and is satisfied if Ms. Pistorese can establish that Aegis and Clare Bridge provided nursing care to at least three continuing inpatients at the facilities.

### c. Whether Aegis and Clare Bridge provided nursing care to at least three continuing inpatients

The next task for the Court is to determine whether there are any issues of material fact regarding whether Aegis and Clare Bridge provided nursing care to at least three continuing inpatients.

First, the Court notes that the responses to the questionnaires Transamerica sent to Aegis and Clare Bridge when evaluating the claims has limited value. Specifically, there is almost no value to the facilities' responses when asked whether they provided "nursing care on a continuing inpatient basis." E.g., Exs. 11, 31 to Hayes Aff. (docket no. 20-4, at

---

[9] Additionally, Transamerica references a 2001 letter in which it offered Mr. Pistorese a supplemental policy that would expressly include care received at assisted living facilities like boarding homes. Ex. 5 to Hayes Aff. (docket no. 20-3, at 2-3.) Mr. Pistorese rejected this offer. Id. (docket no. 20-3, at 4). The Court concludes that the Policy is unambiguous, and therefore it need not consider this piece of extrinsic evidence. Even if it did, the letter would not be determinative. Transamerica's contends that by communicating that Mr. Pistorese's Policy did not cover assisted living facilities, it demonstrates that it never intended for the Policy to cover boarding homes like Aegis and Clare Bridge. Nonetheless, to the extent that the letter demonstrates Transamerica's intent that the Policy should not cover boarding homes, Mr. Pistorese's refusal to purchase the additional coverage could very well indicate the opposite intent, in that he felt that assisted living facilities were already covered and therefore it was unnecessary to purchase additional coverage.

ORDER - 16

3); Exs. 13-14 to Chapman Supp. Decl. (docket no. 23-1, at 4, 12). This is because any response necessarily hinges upon the facilities' interpretation of the precise clause that this Court must resolve. See, e.g., Brigance Dep. at 63:15 – 65:15, Ex. 7 to Chapman Decl. (docket no. 18-4, at 29-31) (discussion between former executive director of Aegis and defense counsel over answers to questionnaire based on differing interpretations of "continuing"); Swendrak Dep. at 13:23 – 16:6, Ex. 9 to Chapman Decl. (docket no. 18-5, at 3-6) (discussion of similar "confusion" regarding Clare Bridge). The fact that the record is replete with quibbling over the meaning of the clause does not create a dispute of material fact as to whether Aegis and Clare Bridge satisfy the Court's interpretation of the second element in the Policy's definition of a nursing home.

Ms. Pistorese successfully carries her burden of establishing that there is no dispute of material fact that Aegis and Clare Bridge provided nursing services to at least three continuing residents. Regarding the numerical requirement, Aegis and Clare Bridge submitted that they have 48 beds and 60 beds, respectively, which Transamerica has never challenged. As to the provision of nursing care, both Aegis and Clare Bridge have consistently stated that they provide intermittent nursing services that include administration of medications, oversight of health care treatments, and other nursing care on an "as needed" basis. See, e.g., Exs. 9, 28 to Hayes Aff.; Brigance Dep. at 86:12 – 87:7, Ex. 7 to Chapman Decl. Transamerica has not put forward any evidence to the contrary. Nor does Transamerica point to any evidence that Mr. Pistorese or any other resident required "frequent" evaluation by a registered nurse such that Aegis or Clare Bridge exceeded their statutory authority. Therefore, the undisputed record evidence

ORDER - 17

establishes that Aegis and Clare Bridge satisfy the second element of the Policy's nursing home definition.

**2. Whether Aegis and Clare Bridge Satisfy the Other Elements of the Nursing Home Definition**

Ms. Pistorese establishes that Aegis and Clare Bridge also satisfy the other four elements of the Policy's "nursing home" definition. Ms. Pistorese briefly points to record evidence showing that both facilities meet the remaining requirements. See Plaintiff's Motion for Partial Summary Judgment at 6-9. Transamerica does not point to any evidence that Clare Bridge fails to satisfy the requirements. Thus, summary judgment is proper on Plaintiff's third cause of action, and also on her first insofar as it relates to Mr. Pistorese's time at Clare Bridge. With respect to Aegis, Transamerica disputes that the boarding home satisfies the fourth and fifth requirements to qualify as a nursing home under the Policy.

Transamerica fails to establish a dispute of material fact about Aegis' compliance with the fourth element. The fourth element requires that a facility have "a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician." Policy at 8. The facility questionnaire submitted by Aegis clearly indicated that it met this requirement. Ex. 12 to Chapman Supp. Decl. (docket no. 23-1, at 5). This fact was affirmed under oath by Aegis' former executive director, who had personal familiarity with the operations and procedures of Aegis during the relevant time. Brigance Dep. at 117:12 – 118:5, Ex. 7 to Chapman Decl. (docket no. 18-4, at 43-44). To rebut this evidence, Transamerica points to a statement by Aegis'

ORDER - 18

corporate representative who responded in the negative when asked whether she was "aware" of such policies and procedures. Moore Dep. at 80:15-21, Ex. D to Hayes Aff. (docket no. 21-3, at 25). However, the corporate representative's lack of awareness about the policies and procedures does not negate their existence. The corporate representative's testimony does not create a dispute of material fact about Aegis's compliance with the fourth element of the Policy's nursing home definition.

Nor is there a dispute of material fact as to whether Aegis satisfies the fifth element. This element requires that a facility maintain "a clinical record of each patient." Aegis's facility questionnaire and former executive director indicated that Aegis keeps clinical records. Ex. 12 to Chapman Supp. Decl. (docket no. 23-1, at 6); Brigance Dep. at 89:19-20, Ex. 7 to Chapman Decl. (docket no. 18-4, at 41). Transamerica takes issue with the testimony of Aegis' corporate representative, who responded in the negative to a question as to whether Aegis has "something that you refer to as a clinical record." Moore Dep. at 81:6-9, Ex. D to Hayes Aff. (docket no. 21-3, at 25). However, the representative later clarified that Aegis does keep extensive medical records, including medical documentation provided by a resident's doctor, nursing notes, and medication records, all of which are updated as needed. Id. at 80:24 – 81:5, 95:7-17. She noted that Aegis simply does not "call it a clinical record." Id. at 95:7. This explanation, which Transamerica does not dispute, demonstrates that Aegis satisfies the fifth element of the nursing home definition, even if it does not formally refer to the medical records as "clinical records."

ORDER - 19

Because there is no genuine dispute of material fact about whether Aegis or Clare Bridge satisfied the remaining elements of the Policy's nursing home definition, summary judgment in favor of Plaintiff on the first three claims is warranted.

**D. Fourth Cause of Action – Bad Faith**

Transamerica moves for summary judgment on Ms. Pistorese's bad faith claim, but it provides no evidence and little argument that there is no dispute of material fact. Rather, Transamerica seems to rely on the argument that if it properly interpreted the second element of the nursing home definition, then it could not have acted in bad faith. In light of the foregoing analysis, this argument must fail. Additionally, "[w]hether an insurer acted in bad faith is a question of fact." Smith v. Safeco Ins. Co., 150 Wn. 2d 478, 484 (2003). The Court DENIES Transamerica's motion on the fourth cause of action.

The Court GRANTS Plaintiff's Motion for Partial Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

The Parties are directed to file a joint status report within 30 days of this Order advising the Court when the Parties can be ready to try the remaining claim of bad faith.

IT IS SO ORDERED.

DATED this 2nd day of August, 2013.

THOMAS S. ZILLY
United States District Judge